UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| METROPOLITAN LIFE INSURANCE COMPANY,<br>                 Plaintiff,<br><br>       v.<br><br>SUSAN J. MINER, et al.,<br>                 Defendants. | Civil Action No. 16-cv-30030-KAR |

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

ROBERTSON, U.S.M.J.

I.  Introduction

This is an action in interpleader concerning entitlement to the proceeds of a life insurance policy (the "Policy") issued by Metropolitan Life Insurance Company ("MetLife") on the life of Ruth E. Wright ("Wright"), now deceased. MetLife was dismissed from the action after it deposited the policy proceeds plus accumulated interest with the clerk of the court. The claimants, Susan J. Miner ("Miner"), Marcia Brown ("Brown"), and Pamela Whitacre ("Whitacre") – the latter of whom is named in her capacity of Executrix of Wright's Estate – are all daughters of Wright's. Miner claims that she is the rightful recipient of the funds because, in 2011, Wright assigned ownership of the Policy to her, and she became the sole primary beneficiary. Brown and Whitacre maintain that the document whereby the assignment was accomplished is a forgery, and Wright's Estate is the rightful beneficiary. The parties, all of whom proceeded *pro se*, consented to the exercise of this court's jurisdiction for all purposes. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. After a two-day bench trial, the court finds that Miner is the owner and beneficiary of the Policy and is entitled to the Policy proceeds.

II.     Findings of Fact[1]

Wright obtained the Policy on March 3, 1983, through her insurance agent, Paul Catelotti. She named her Estate as the sole primary beneficiary of the Policy proceeds. The Policy contained the following provisions regarding changing owners and beneficiaries:

> **Change of Ownership** – You may name a new owner at any time.
> ….
>
> **Beneficiary** – The beneficiary is the person or persons to whom the insurance proceeds are payable when the insured dies. …. If no beneficiary or contingent beneficiary is named … the owner (or the owner's estate) will be the beneficiary.
> ….
>
> **How to Change the Owner or the Beneficiary** – You may change the owner, contingent owner, beneficiary or contingent beneficiary of this policy by written notice or assignment of the policy.

On November 23, 1993, Wright assigned ownership of the Policy to Flynn & Dagnoli Funeral Home, Inc., ("Flynn & Dagnoli") in North Adams, Massachusetts, and Flynn & Dagnoli became the sole primary beneficiary. Wright had entered into a pre-need funeral/burial contract with Flynn & Dagnoli to be buried in Massachusetts, where she resided at the time, and she executed the assignment in Flynn & Dagnoli's favor in order to fund the arrangement. Wright's son, Robert Wright ("Robert"), was with Wright when she made the prearrangements with Flynn & Dagnoli, and he assisted her in the process.

Wright moved to Florida in 2009. On September 24, 2009, Wright executed a durable power of attorney ("POA") appointing Miner, who also lived in Florida, as her agent to handle various financial and legal matters on her behalf, including the authority to "act[ ] as [her] attorney or proxy with respect to any policy of insurance on [her] life, and in such capacity to

---

[1] The court states its findings of fact and conclusions of law separately, as required by Federal Rule of Civil Procedure 52(a)(1).

exercise any rights, privileges or options which [she] may have thereunder and pertaining thereto."

Sometime after her move to Florida, Wright also completed and signed a "Five Wishes" document, an end-of-life planning tool, in which she stated her desire to have her body cremated after her death.[2] Miner provided a copy of Wright's "Five Wishes" to Claudia Hunter ("Hunter"), one of her sisters, and another of Wright's daughters, who also lived in Florida. Because of their proximity to their mother, Miner and Hunter both acted as caregivers for their mother in her final years.

In late April or early May 2011, Miner called Robert and informed him that Wright had designated Miner as her power of attorney and that her funeral prearrangements were to be moved from Massachusetts to Florida. Miner asked Robert where Wright's life insurance policy was, and Robert advised that it was with Flynn & Dagnoli.

In a document dated May 18, 2011, Flynn & Dagnoli transferred its rights and interests in the Policy and its proceeds back to Wright. Miner contacted Catelotti by telephone and requested that he send Wright the appropriate document for Wright to transfer ownership of the Policy to Miner.[3] Catelotti mailed a two-page "Absolute Assignment" form to Wright (the "Absolute Assignment"). The Absolute Assignment provides that it is "only for a complete Transfer of Ownership," and the "new owner[ ] will be the primary beneficiary [ ] unless a different beneficiary designation is made by the new owner." Catelotti sent the Absolute Assignment with certain information already filled in, including the number of the Policy, Wright's name in the spaces provided for "Insured" and "Owner," and Miner's name in the

---

[2] The document is undated, and there was no testimony at the trial establishing the date on which it was executed.
[3] Miner testified at trial that she called Catelotti with Wright on the line. Catelotti did not recall Wright being party to the call. It is unnecessary for the court to resolve this discrepancy.

3

spaces provided for "Assignee." The Absolute Assignment provides that, by executing it, "Owner … assign[s] ownership of the policy with all rights, powers, interests, privileges, benefits, options, sums of money and all proceeds under the policy to: Assignee." Catelotti included check marks on the first page next to a space for "Owner's Initials" and on the second page next to spaces for "Signature of Owner" and "Signature of Assignee." The form includes "Signature Requirements," specifying that "[a]ll signatures should be witnessed by a disinterested adult." Each signature block – one for Owner and one for Assignee – includes spaces for two witnesses to sign and print their names.

Miner testified at trial that Wright initialed and signed the Absolute Assignment on May 20, 2011, in the manager's office of the apartment complex where Wright resided, in front of Miner and co-managers Jacqueline Safford and Jackie Shepard. Both Safford and Shepard then signed the document as witnesses.[4] After it was executed, Miner returned the Absolute Assignment to Catelotti by mail.

Catelotti observed upon receipt that Wright's signature looked similar to previous signatures of hers that he had on file, and he forwarded the Absolute Assignment to the MetLife home office for recording.

At some point after moving to Florida, Wright was diagnosed with cancer. By January 6, 2015, Wright had become quite ill and was in considerable pain, and she was admitted to the hospital. While in the hospital, Wright had a conversation with Brown about wanting her last wishes changed; she no longer wanted her remains to be cremated, but rather, once again, wanted to be buried in Massachusetts. Wright expressed concern to Brown that Miner would be "mad"

---

[4] These same two individuals acted as witnesses to Wright's signature on her Five Wishes document.

about the change, but Brown assured Wright that her last wishes would happen. Thereafter, Hunter contacted Wright's attorney.

Wright was discharged from the hospital to a nursing home under hospice care on January 16, 2015. On January 19, 2015, Wright executed a new durable POA designating Hunter or Robert as her agent to handle various financial and legal matters on her behalf, excluding the power to create or change beneficiary designations.[5] At the same time, Wright executed a Last Will and Testament stating that it was her desire to be buried in North Adams, MA, by Flynn & Dagnoli. Hunter's husband, Louis Hunter ("Louis"), was present for Wright's execution of the will, and he signed it as a witness. According to Louis, Wright's attorney was scheduled to meet with Wright at the nursing home at 10:30 a.m. that day. Miner was unaware that Wright was going to be meeting with her attorney to sign a new POA and will, and she showed up unexpectedly at 10:00 a.m. Miner ended up staying only about ten minutes, and, after she left, Wright made a comment to Hunter and Louis to the effect of, "Wow, that was close," the implication being that Miner had nearly found out about her intention to change her arrangements.

Wright died on February 3, 2015.

On March 5, 2015, Brown contacted Carole Mallard at MetLife and advised Mallard that she did not believe the signature on the Absolute Assignment was Wright's. By March 23, 2015, Brown believed that the signature was Wright's, but that the initials were not, and she contacted Mallard and advised her accordingly.

Two forensic document examiners, Jan Leach and William Smith, testified at the trial. The court found that both Leach and Smith were qualified to offer expert opinion testimony on

---

[5] Miner claims that the document was not properly notarized, but that issue need not be addressed for purposes of resolving the dispute between the parties.

handwriting examination based on their training and experience. The two collaborated in reaching their opinion that the initials and signature on the Absolute Assignment were not Wright's. In their written report, Leach and Smith explained that they compared the questioned initials and signature on the Absolute Assignment with known samples of Wright's initials and signature that had been provided to them, consisting of Wright's initials on a November 2011 will and the January 2015 POA, and Wright's signatures on the same November 2011 will, a 2011 affidavit, and a 2009 POA. Leach and Smith concluded in their report that, "[t]here are too many fundamental differences in both the initials and signature on the questioned document for them to be genuine." They went on to state that,

> [m]ore compelling, however, is that the signature in question nearly matches a known signature from [a] Durable Power of Attorney signed two years before. It is a poorly made simulation or tracing appearing on the questioned document. Therefore, it is our opinion that Ruth E. Wright did not make the initials nor did she sign the document in question.

Leach testified that a fundamental principal of document examination is that an individual can never write his or her name the same exact way twice; there is always natural variation. Forensic document examiners, therefore, have to know the difference between natural variation and fundamental differences. According to Leach, she and Smith identified 16 fundamental differences in the initials and signature on the Absolute Assignment as compared to the known samples, which they enumerate one-by-one in their report. Because "the authorities" provide that two or more fundamental differences are enough to raise a flag, sixteen was too many for the initials and the signature on the Absolute Assignment to be genuine. Smith identified what he viewed as the most outstanding of the so-called fundamental differences. Regarding Wright's initials, Smith noted that, in the known samples, Wright's initials were scripted, while, in the Absolute Assignment, they were printed. Regarding Wright's signature,

Smith observed that in each of the known samples, the second loop of the "W" beginning Wright's last name was raised as compared to the first, while in the Absolute Assignment, this was reversed with the second loop being lower than the first. Smith also noted that Wright's middle initial "E" in each of the known signatures slants to the right, while, in the Absolute Assignment, it is more vertical. In addition to noting the presence of fundamental differences, both Leach and Wright testified to the similarity between the signature on the Absolute Assignment and the signature on the 2009 POA, with Leach testifying that they thought the former was a simulation or copy, albeit poor, of the latter.

Having heard all of the evidence, the court finds by a preponderance of the evidence that the initials and signature on the Absolute Assignment are Wright's, as testified to by Miner. The court is persuaded that Wright initialed and signed the Absolute Assignment in 2011 to change ownership of the Policy from Flynn & Dagnoli to Miner in line with her changed wishes at the time that her remains be cremated rather than buried in Massachusetts upon her death. While Wright may have changed her wishes again in her final days and once again decided that she wanted her body to be buried in Massachusetts, this would not affect the validity of the already-completed Absolute Assignment. The court's finding is consistent with the testimony that Wright did experience such an end-of-life change of mind; the only reason Wright would have needed to change her wishes back to burial in Massachusetts would be if she had changed them to something else earlier. In not crediting Leach and Smith's expert opinion that the initials and signature on the Absolute Assignment are a forgery, the court notes that their opinion is based on their subjective judgment and is at least somewhat internally inconsistent, premised as it is on their determination that the questioned signature is both too different (i.e., too many fundamental differences in comparison with the known samples) and too similar (i.e., a poor simulation or

7

copy of the known signature on the 2009 POA) to be genuine. The court also notes that their conclusion conflicts with Catelotti's observation that the signature on the 2011 Absolute Assignment was similar to other signatures that he had on file for Wright, and Hunter's conclusion that the signature was that of her mother after initially suspecting that it was not.

III. CONCLUSIONS OF LAW

> In interpleader, the plaintiff ordinarily is a mere stakeholder who solicits the assistance of the court in order to avoid potentially inconsistent liabilities." *See* 4 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 22.02[1] (3d ed. 2006)). The stakeholder-plaintiff names as defendants those who are potential claimants to the stake. *See id.* Typically, the defendants are not antagonistic to the plaintiff but, rather, are pitted against one another. …. [I]n an interpleader action in which the stakeholder does not assert a claim to the stake, the stakeholder should be dismissed immediately following its deposit of the stake into the registry of the court. *See, e.g., Comm'l Union Ins. Co. v. United States*, 999 F.2d 581, 583 (D.C. Cir. 1993).

*Hudson Savs. Bank v. Austin*, 479 F.3d 102, 107 (1st Cir. 2007). Once the interpleader plaintiff is dismissed, as MetLife has been in this case, what remains to be resolved are the respective rights of the claimants to the stake. While the claimants nominally are defendants, the action becomes a *de facto* suit between them. *Id.* at 107-08 (citing *United States v. Palmer*, 956 F.2d 3, 7 (1st Cir. 1992)). They are "at once [both] plaintiffs and defendants, [each] seeking a share of the [stake] disputed by the other." *Hudson Savs. Bank*, 479 F.3d at 108 (first alteration in original) (quoting *Palmer*, 956 F.2d at 7).

In the usual case, "each claimant has the burden of establishing the right to the fund or property by a preponderance of the evidence." 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1714, at 629 & n.21 (3d ed. 2001). But, in cases where a party is claiming the proceeds of a life policy as against the originally named beneficiary, as in this case, that party (here, Miner) has the burden of showing a valid change of

8

beneficiary. *Finegan v. Prudential Ins. Co. of Am.*, 14 N.E.2d 172, 174 (Mass. 1938) ("The amount due on the policies was payable to the plaintiff as the beneficiary named therein unless the claimant was entitled to the whole, or a part thereof, by reason of assignments of the policies … [and] [t]he burden of establishing its claim … was on the claimant."); *Kochanek v. Prudential Ins. Co. of Am.*, 159 N.E. 520, 522 (Mass. 1928) ("The claimant has failed to sustain the burden which was upon him to show a valid change of the beneficiary in the lifetime of the assured."); *Garner v. Bemis*, 87 So. 426, 427 (Fla. 1921).[6] *Accord* 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1714, at 629 & n.21 (3d ed. 2001) (citing *Follenfant v. Rogers*, 359 F.2d 30, 31 (5th Cir. 1966) (applying Texas law)). Thus, the burden was on Miner to establish the validity of the Absolute Assignment.

Miner met her burden. The parties agree that Wright was competent in 2011 to make end-of-life decisions. The preponderance of the evidence establishes that Wright initialed and signed the Absolute Assignment in 2011, and thereby "assign[ed] ownership of the [P]olicy with all rights, powers, interests, privileges, benefits, options, sums of money and all proceeds under the [P]olicy" to Miner. Because Miner did not designate a different beneficiary, she also became the primary beneficiary.

IV. CONCLUSION

---

[6] Under the facts of this case, there are two possible interested jurisdictions, Massachusetts and Florida, presenting a possible choice-of-law issue. But, "[t]he first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions, here, Massachusetts and [Florida]." *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004). Massachusetts and Florida appear to be in agreement that the burden under these circumstances is on the later designated beneficiary and, thus, there is no conflict.

The proceeds of the Policy issued by Metropolitan Life Insurance Company, which have previously been paid into this court, shall be paid, with accrued interest, to Susan Miner. Judgment shall enter in Susan Miner's favor, and the case shall be closed on the court's docket.

So Ordered.


Dated: April 18, 2017                    /s/ Katherine A. Robertson
                                         KATHERINE A. ROBERTSON
                                         UNITED STATES MAGISTRATE JUDGE